**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA INDIANAPOLIS DIVISION**

| | |
|---|---|
| **MARY COX and JEREMY COX**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**INDIANA DEPARTMENT OF CHILD SERVICES**, **CANDACE SEXTON**, in her individual capacity, and **ANNETTE LEHMAN**, in her individual capacity,<br><br>*Defendants*. | No. 1:23-cv-00957-RLY-MG<br><br>**SECOND AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**SECOND AMENDED VERIFIED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND JURY DEMAND**

Plaintiffs Mary Cox ("Mary") and Jeremy Cox ("Cox") (collectively the "Parents" or "Plaintiffs"), by counsel, and for their Complaint for Damages and Injunctive Relief and Jury Demand against Defendants Indiana Department of Child Services ("DCS"), Candace Sexton in her individual capacity, and Annette Lehman in her individual capacity, allege as follows:

## INTRODUCTION

This case arises under the First and Fourteenth Amendments to the United States Constitution, 42 USC § 1983, Article I of the Indiana Constitution, the Indiana Religious Freedom Restoration Act, and Indiana common law causes of malicious prosecution, abuse of process, and violations of Ind. Code § 34-52-1-1.

Defendants, while acting under the color of state law and in the scope of their employment, initiated an investigation of the Parents because they were referring to their child, A.C., in a manner consistent with A.C.'s biological sex instead of using cross-gender pronouns or a name inconsistent with A.C.'s biological sex.

During the initial investigation, the Parents informed the Defendants of (1) their sincerely held religious beliefs and carefully researched judgment concerning the use of cross-gender pronouns and names inconsistent with a child's biological sex and (2) that they were following the recommendations of A.C.'s primary care physician in caring for A.C.'s medical and mental health needs. The Defendants did not request consents or written documentation of such care.

Instead of respecting the Parents' beliefs and best judgment and considering the exculpatory evidence the Parents provided, the Defendants initiated a CHINs action against the Parents and petitioned for removal of A.C. from the Parents' custody. In the Preliminary Inquiry Report, the Defendants falsely and intentionally misrepresented the following:

(a) That the Parents admitted to knowing about an eating disorder for a year without seeking treatment—even though the Parents informed the Defendants that they were following the recommendations of A.C.'s primary care physician and had already met with a specialist on eating disorders.

(b) That the Parents refused to give the Defendants consent to review medical or mental health records—even though the Defendants never requested such consents.

(c) That the Parents had pulled A.C. from therapy after two months—even though the Parents informed the Defendants A.C. had been in therapy for almost ten months prior to searching for a new provider and that they had already scheduled a full mental health exam with a psychotherapist.

(d) That the Parents had refused resources to remedy the CHINs condition by declining to accept materials—even though the Parents simply requested the opportunity to review the literature on parenting non-cisgender children as they believed those materials were written in a manner contrary to their religious beliefs.

(e) That A.C was suffering from a lack of mental and emotional support and that A.C. would be more likely to have thoughts of self-harm if left in the home—even though DCS admitted there was no mental health diagnosis and A.C. did not express thoughts of self-harm during an interview.

(f) That the Parents had unenrolled A.C. from a residential high school—without including the relevant fact that A.C. had completed the academic year and the Parents were already in the process of enrolling A.C. in a new school.

The trial court relied on these false representations by declaring A.C. a Child in Need of Services prior to the Parents being given an opportunity to testify or present exculpatory evidence at the initial hearing. The trial court also removed A.C. from the Parents' custody. The Defendants advocated for a kinship placement chosen specifically because that placement would use cross-gender pronouns and generally affirm A.C.'s identification as a female in a manner contrary to the Parents' religious beliefs and best judgment, and the trial court relied on that recommendation in placing A.C. outside of the home. The trial court also ordered the Parents to keep all of A.C.'s scheduled medical and mental health appointments and did not order additional treatment.

The Defendants later substantiated the allegations of neglect against the Parents even after the Parents provided written confirmation that they were providing for A.C.'s medical, educational, and mental health needs.

After litigating for more than five months, the Defendants voluntarily dismissed and unsubstantiated all allegations of neglect against the Parents. A.C. was out the Parents' custody during this period, and the Parents were limited to a few hours of visitation one day a week.

The Defendants' actions gravely interfered with the Parents' constitutional rights and deprived them of time with A.C. that they will never get back. Further, the Parents have every reason to fear that the Defendants will employ similar methods, policies, or practices to interfere in their home again and in the relationship between them and their other minor children. Therefore, they are bringing this Complaint for injunctive, declaratory, compensatory, and nominal relief.

## PARTIES

1. Plaintiff Mary Cox is a resident of Madison County, Indiana, and a citizen of the United States.

2. Plaintiff Jeremy Cox is a resident of Madison County, Indiana, and a citizen of the United States.

3. At all relevant times, the Plaintiffs were and are residents of the state of Indiana.

4. Defendant Indiana Department of Child Services is an agency or instrumentality of the State of Indiana which receives federal financial assistance.

5. Defendant Candace Sexton was, at all relevant times, employed by Defendant Indiana Department of Child Services (DCS) as the Family Case Manager responsible for handling the investigation relevant to this litigation.

6. Defendant Annette Lehman was, at all relevant times, employed by DCS as the Supervisor of Candace Sexton and personally participated in this matter.

## JURISDICTION AND VENUE

7. This civil-rights action raises federal questions under the U.S. Constitution, namely its First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983; and, it also raises claims under Indiana's Religious Freedom Restoration Act, Ind. Code §§ 34-13-9-0.7 through -11.

8. This Court thus has original subject-matter jurisdiction over this action, 28 U.S.C. §§ 1331, 1343, and personal jurisdiction over Defendants, Ind. R. Trial P. 4.4(A).

9. This Court has supplemental jurisdiction over Plaintiff's state-law claim. 28 U.S.C. § 1367; *see* Ind. Code § 34-13-9-9 (creating a private cause of action for violations of Indiana's Religious Freedom Restoration Act).

10. Venue is proper in this District and Division, because the individual Defendants, to the Plaintiffs' knowledge, reside in this Division; because DCS maintains its principal office in this Division 28 U.S.C. § 1391(b)(1), (c)(2); and because all the events giving rise to Plaintiffs' claims occurred within this Division, *id.* § 1391(b)(2). *See id.* § 94(b)(1) (establishing this Division's boundaries).

11. This Court has authority to award the requested damages, *id.* § 1343; the requested declaratory relief, *id.* §§ 2201–02; *see* Fed. R. Civ. P. 57; the requested equitable relief, 28 U.S.C. § 1343; *see* Fed. R. Civ. P. 65; and, costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

*See also* Ind. Code § 34-13-9-10 (providing relief for violations of Indiana's Religious Freedom Restoration Act).

## FACTUAL BACKGROUND

12. Mary and Jeremy Cox have been married for twenty-five years.

13. They are both gainfully employed. Mary has a Masters of Science Degree in Biochemistry and Molecular Biology and works as a clinical studies manager; and Jeremy works as a software engineer.

14. Mary and Jeremy find joy in providing well for and raising their family in a community of family and friends that they have developed over the years.

15. Prior to the incidents related in this Complaint, Mary and Jeremy Cox had never interacted with the Department of Child Services.

16. Mary and Jeremy have cared for A.C's medical, educational, and mental health needs since birth.

### The Parents' Religious Beliefs

17. Mary and Jeremy Cox are devout Christians that attend church regularly.

18. Mary and Jeremy believe that God created the family and charged parents with the primary responsibility for raising, guiding, and caring for their children.

19. Because of parents' God-given responsibilities for their children, Mary and Jeremy believe that they are essential to maintaining the physical and mental well-being of their children.

20. Mary and Jeremy also believe that each person's sex is fixed by biology from birth, rather than assigned by another person; that this sex is an immutable gift from God; and that it is not possible to change a person's sex.

21. Mary and Jeremy' faith does not prevent them from using nicknames or attempting to work and live with others that hold different beliefs; however, their faith requires them to refrain from speaking in a manner that their faith instructs is immoral, dishonest, or harmful.

22. In particular, the Parents' sincerely held religious beliefs about honesty prevent them from affirming or communicating views about human nature or sex and gender contrary to their religious beliefs.

23. The Parents believe that to affirm or communicate such views is tantamount to lying.

24. These beliefs also prevent the Parents from referring to a child using pronouns or names that are inconsistent with the child's sex.

25. Using such cross-gender pronouns to address or refer to that child communicates a message—namely, the message that what makes a child a boy or a girl is that child's personal sense of being a boy or girl rather than the child's sex—that is inconsistent with the Parents' religious beliefs.

26. It harms the Parents to force them to communicate this message by using cross-gender pronouns or otherwise treating a child as a gender identity different than the child's sex because it forces them to express something they believes is untrue and harmful to their children.

27. Being forced to use cross-gender pronouns or names inconsistent with their child's biological sex harms the Parents by undermining their ability to share their faith at home and in their community.

28. If the Parents claim outside of their home that using cross-gender pronouns or names inconsistent with a child's biological sex is harmful, then use such pronouns and names in their home, they would communicate (1) that they do not actually believe that the use of such cross-gender names or pronouns are harmful or (2) that they are willing to compromise such beliefs to avoid the state's scrutiny or public censure—neither of which is true.

**The Parents' Beliefs Concerning the Use of Cross-Gender Pronouns or Names Inconsistent with a Child's Biological Sex**

29. In addition the Parents' religious views, based on scientific evidence and their own experience as parents, Mary and Jeremy believe that using cross-gender pronouns or names inconsistent with a child's biological sex hurts children.

30. The Parents understand that children do not have a fully developed capacity to understand the long-term consequences of their decisions, and they want to help their children refrain from doing anything that would hurt them or create an unreasonable risk of harm.

31. In particular, the Parents were and are aware of an increase in children expressing a gender identity that is inconsistent with their sex and an accompanying request to be addressed with a different name consistent with the new identity and pronouns that are inconsistent with their sex.

32. The Parents understand and understood that most children who at some point express a gender identity inconsistent with their sex will eventually return to expressing an identity in harmony with their sex.

33. For these children, all interventions—whether psychosocial, pharmaceutical, or surgical—that further entrench the gender identity inconsistent with the child's sex are harmful.

34. The Parents wants to protect their children from making potentially irreversible and life-changing decisions that they may later regret.

**Additional Background Concerning Medical and Mental Health Treatment**

35. In December of 2019, A.C. left a note for the Parents stating that A.C. identifies as a girl.

36. By February of 2020, the parents had sought and procured therapeutic care for A.C.

37. During a wellness check in February of 2020, A.C.'s primary care physician expressed concerns about A.C.'s lack of weight gain but did not make a referral for further treatment.

38. In December of 2020, after 10 months of therapeutic care, the parents determined that A.C.'s therapist was not providing substantial assistance with the identity issue or with family dynamics and sought out a new therapist.

39. During the 2020-2021 school year, A.C. attended the Indiana Academy of Science, Mathematics, and Humanities, a residential high school on the campus of Ball State University.

40. While A.C. was attending Indiana Academy of Science, Mathematics, and Humanities, the Parents monitored A.C.'s weight and eating habits.

41. A.C. completed the 2020-2021 school year, and the Parents unenrolled A.C. from the Indiana Academy of Science, Mathematics, and Humanities upon completion of the school year due to concerns about A.C.'s weight and academic performance and because A.C. did not want to continue at the Academy as a commuter student.

42. On May 18, 2021, Jeremy Cox began the process of enrolling A.C. at Indiana Connections Academy.

43. At a wellness check in April of 2021, A.C.'s primary care physician referred A.C. to a specialist on eating disorders and recommended a psychosocial evaluation.

44. The Parents followed up on these referrals and requested appointments with a specialist on eating disorders and a psychotherapist by the end of April of 2021.

45. On May 7, 2021, A.C. attended an initial appointment—scheduled by the Parents—at the specialist for eating disorders to determine further treatment.

46. On May 18, 2021, Mary attended an on-boarding appointment with a psychotherapist and scheduled a full mental health evaluation for A.C. on June 3, 2021.

47. In seeking treatment for concerns about A.C.'s weight loss and eating habits, the Parents followed the recommendations of A.C.'s primary care physician.

48. Throughout this period, the Parents engaged in conversations with A.C. concerning their religious beliefs and gender identity and attempted to find middle ground by using the nickname "A."

49. The Parents completed (or at least scheduled) all of the above measures to care for A.C. prior to the state's interference in their home.

## The Investigation

50. On May 14, 2021, DCS caseworker Candace Sexton called Mary Cox to discuss a concern about the Parents' minor child, A.C.

51. Sexton began the conversation by referring to A.C. using cross-gender pronouns and a name inconsistent with A.C.'s biological sex, and Mary informed Sexton of her religious and carefully researched objections to using cross-gender pronouns and names.

52. Sexton then disclosed that A.C.'s school had reported a written note from A.C. claiming that the Parents were heavily transphobic and that A.C. did not feel safe at home.

53. Sexton also inquired generally about A.C.'s mental health.

54. Mary informed Sexton that the Parents were working with A.C. in an attempt to navigate the disagreement over their religious beliefs and gender identity and that they were doing so in a manner consistent with those religious beliefs and best judgment.

55. Mary informed Sexton that they, the Parents, were also following the recommendations of their primary care provider and that they had followed up on his referrals to a specialist in eating disorders and a psychotherapist.

56. She also informed Sexton that A.C. had already attended one visit with the eating disorder specialist and was scheduled for several more appointments as part of the evaluation process.

57. She further informed Sexton that an on-boarding visit was scheduled with the psychotherapist on May 18, 2021.

58. She also told Sexton that A.C. had been in therapy for approximately 10 months from February 2020 through December 2020, and that the Parents were actively seeking another therapist.

59. Sexton asked if she could visit the Cox residence and interview the children, and Mary agreed.

60. On May 17, 2021, Sexton arrived at the Cox residence and interviewed all of the Parents' minor children in the presence of the Parents.

61. When Sexton interviewed A.C., Sexton suggested to A.C. that A.C. had experienced gender dysphoria since age 10, and A.C. agreed with Sexton's suggestion.

62. When Sexton asked if A.C. felt safe in the home, A.C. responded by stating he did not feel respected and emotionally supported for who he was at home because his family did not use his preferred name and pronouns but stated there was no physical abuse and that he was not worried about being harmed.

63. A.C. did not report thoughts of self-harm during the interview.

64. Sexton then interrogated the Plaintiffs at their home.

65. Sexton inquired about A.C.'s weight and eating habits, and the Parents informed Sexton again about the primary care physician's recommendation and the scheduled evaluation and treatment with a specialist on eating disorders.

66. Sexton then inquired about the use of preferred pronouns and names, and Mary explained the use of the nickname "A" in an effort to navigate the disagreement with A.C.

67. Sexton then asked Mary and Jeremy if she could send them resources on parenting LGBTQ children.

68. Mary and Jeremy agreed to accept those resources but explained that such materials are often written in a manner contrary to their religious beliefs.

69. Sexton then asked if she could send LGBTQ materials directly to A.C., and Mary and Jeremy stated that such materials should be sent to them first so they could review for any statements or information contrary to their religious beliefs and best judgment.

70. Sexton did not request medical consents or ask for proof of medical or mental health treatment and left after the interview of the children and the interrogation of the Parents at their home.

**The CHINS Petition and Initial/Detention Hearing**

71. On May 28, 2021, Sexton and Lehman signed, under the penalty for perjury, a Preliminary Inquiry Report ("PIR") that included numerous misrepresentations.

72. Also on May 28, 2021, the Department of Child Services, through counsel, filed a Verified Petition Alleging a Child to be a Child in Need of Services ("CHINS Petition") based on allegations in the PIR.

73. Sexton signed this CHINS Petition under the penalties for perjury.

74. DCS also filed a Request for Taking or Continued Custody on May 28, 2021, stating that it was in the child's best interest to be removed from the Parents' home and that reasonable efforts had been made to prevent removal by providing resources to the family, which had been refused.

75. On June 1, 2021, the Parents were surprised to receive a summons with a CHINS Petition along with the Preliminary Inquiry Report signed by both Sexton and Lehman.

76. Defendants' decision to file this Petition was based entirely on the allegations which had been made against the Parents and by refusing to consider any exculpatory evidence.

77. In the PIR and the CHINS Petition, the Defendants focused heavily on A.C.'s educational, medical, and mental health treatment.

78. In fact, the reporting sources only raised concerns about the Parents' referring to A.C. by A.C.'s birth name and masculine pronouns as evidence of emotional abuse.

79. The Defendants determined, in the course of their investigation, to expand the allegations to include educational and medical neglect.

80. In the PIR and CHINS Petition, the Defendants falsely claimed that the Parents admitted that they had concerns about an eating disorder for a year and failed to seek treatment for that disorder.

81. In fact, the Parents were following the recommendations of A.C.'s primary care physician and had already scheduled and attended an appointment at a specialist for an eating disorder. And Mary informed Sexton of this treatment at least twice.

82. In the PIR, the Defendants further claimed that Mary refused to sign any consents to verify medical treatment or therapy services.

83. In fact, neither Sexton nor Lehman requested such consents from the Parents.

84. In the PIR, the Defendants included a report that A.C. had been pulled from therapy after two to three months.

85. In fact, the Parents informed Sexton that A.C. had been in therapy for approximately ten months, that they were actively seeking a new therapist, and that they were following their primary care physician's recommendation in procuring a full mental health exam.

86. In the PIR and the CHINS Petition, the Defendants included allegations that Mary Cox used vulgar language toward A.C. as evidence of abuse and/or neglect by both Parents.

87. In fact, Mary denied the use of such vulgar and demeaning language toward A.C. and explained that the Parents' sincerely held religious beliefs and best judgment prevented them from using cross-gender pronouns and names.

88. Neither A.C. nor the reporting sources alleged that Jeremy Cox used vulgar language.

89. The PIR and CHINS Petition included allegations that the Parents unenrolled the Child from Indiana Academy of Science, Mathematics, and Humanities on May 14, 2021, and that the school had received no correspondence from the Parents about future educational plans for A.C.

90. DCS did not include any statement or evidence that A.C. had completed the 2020-2021 academic school year.

91. In fact, A.C. had completed the 2020-2021 academic school year by May 14, 2021, and the Parents had already begun the enrollment process at another academic institution.

92. The Defendants falsely claimed in the PIR that A.C.'s sex is female.

93. In fact, A.C. is a biological male.

94. The Defendants falsely claimed in the PIR that A.C. had experienced gender dysphoria since age 10.

95. In fact, Sexton suggested to A.C. that A.C. had experienced gender dysphoria since age 10—then reported A.C.'s agreement with her suggestion as a fact.

96. The Defendants admitted in the PIR that there was no specific diagnosis concerning the child at the time of investigation. Yet, the Defendants claimed in the PIR and CHINS Petition that A.C. was suffering from a lack of mental and emotional support in the household.

97. The Defendants further stated in the PIR that A.C. would be more likely to have thoughts of self-harm if allowed to remain in the home due to mental and emotional abuse.

98. In fact, there was no specific diagnosis concerning A.C. at that time, and A.C. did not report thoughts of self-harm during Sexton's interview of A.C.

99. The PIR included allegations that the Parents failed to support A.C. by using A.C.'s preferred name and pronouns while DCS repeatedly used A.C.'s birth name and masculine pronouns in the PIR.

100. The Defendants focused on one primary claim in the PIR and CHINS Petition: the Parents were not emotionally supporting A.C. because they would not affirm A.C.'s identification as a girl or use cross-gender pronouns and names.

101. In fact, the Parents were providing for A.C.'s physical, medical, educational, and mental health needs and were referring to and raising A.C. in a manner consistent with their religious beliefs and best judgment.

102. The Parents did not affirm A.C.'s identification as a girl or use cross-gender pronouns and names because such speech and behavior would have violated their sincerely held religious beliefs and contradicted the Parents' own thorough research.

103. The Defendants included in the PIR and in the CHINS Petition their lay opinion and viewpoint that referring to and raising A.C. consistent with A.C.'s biological sex amounted to neglect sufficient to merit removal of a child from a parent's custody.

104. The Request for Taking or Continued Custody relied on the Defendants' allegations in the PIR and CHINS Petition.

105. The Request for Taking or Continued Custody claimed that DCS made reasonable efforts to prevent removal because DCS attempted to engage parents with services and resources to engage the CHINS condition, which the parents refused to accept.

106. In fact, the Parents offered to accept the resources related to parenting non-cisgender children but noted that such resources contradicted their deeply held religious beliefs and best judgment.

107. And the Parents declined a request by Sexton to send resources directly to A.C. without an opportunity to review them first.

108. The Defendants' statements in the PIR and CHINS Petition, taken together with the Request for Taking or Continued Custody, alleged that the Parents' exercise of their deeply held religious beliefs and best judgment concerning cross-gender pronouns and names amounted to neglect sufficient to merit removal of a child from a parent's custody.

109. These allegations and actions were contrary to DCS policy that services to families are to be provided with respect for cultural and religious heritage.

## CHINS Finding, Removal from the Parents' Home and Dismissal of the Allegations

110. At the initial court hearing on June 2, 2021 and in reliance on the Defendants' misrepresentations in the PIR and CHINS Petition, the trial court determined A.C. was a Child in

Need of Services prior to the Parents being given an opportunity to testify or present exculpatory evidence.

111. The trial then removed A.C. from the custody of the Parents in reliance on the Defendants' misrepresentations in the PIR and CHINS Petition.

112. The trial court also barred the parents from speaking about the topic of transgenderism with A.C. based on the misrepresentations of the Defendants.

113. The Defendants recommended that A.C. be placed in a kinship placement with a specific qualification: the placement must affirm A.C.'s identification as a girl and use A.C.'s cross-gender pronouns and name. And the trial court followed the Defendants' recommendation concerning placement.

114. Despite the Defendants' allegations concerning failure to provide medical or mental health treatment, the trial court ordered the Parents to keep A.C.'s appointments made by the Parents prior to the court hearing and did not order additional mental health or medical care.

115. The Defendants also substantiated the allegations of neglect against both Mary and Jeremy Cox after receiving written confirmation that the Parents were providing for the educational, medical, and mental health needs of A.C.

116. Throughout the course of their actions, the Defendants knowingly made numerous false, misleading, unconfirmed and/or uncorroborated statements in order to justify removing A.C. from the Parents' care.

117. Based upon the misrepresentations made by Defendants, the state court ordered that A.C. be removed from the care of the Parents.

118. Prior to the Fact-Finding Hearing or trial in this matter on November 15, 2021, DCS moved to voluntarily dismiss all allegations of neglect against the parents and voluntarily unsubstantiated the allegations of neglect against Mary and Jeremy Cox.

119. This dismissal came despite the fact that Defendants had previously substantiated the allegations of neglect against the Parents and petitioned for the removal of A.C. from the Parents' care.

120. A.C. remained out of the Parents' care throughout this period, and the Parents were limited to a few hours of visitation one day a week.

121. Throughout this period, A.C. was placed in a kinship placement that taught principles directly contrary to the Parents' deeply held religious beliefs and best judgment.

122. This entire ordeal has traumatized the family and damaged the Parents' relationship with A.C.

123. Mary and Jeremy currently have three minor children, and they live in a state of fear and concern, not knowing what DCS will do next.

## FIRST CAUSE OF ACTION
## Violation of the Fourteenth Amendment to the U.S. Constitution: Defendants Sexton and Lehman
### *Intrusion upon the autonomous family relationship*

124. Plaintiffs incorporate all of the paragraphs above as fully set forth herein.

125. Defendants unlawfully infringed upon the rights of both Mary and Jeremy Cox when they investigated the family for constitutionally protected actions and speech and made misrepresentations in the PIR and CHINS Petition that led to the removal of A.C. from the Parents' care.

126. Defendants caused undue interference in the family relationship of the Plaintiffs.

127. Defendants' conduct violated the substantive due process rights of Mary and Jeremy to direct the care and upbringing of A.C. and to protect A.C.

128. Defendants acted under color of state law.

129. Defendants' conduct deprived Mary and Jeremy of rights protected by federal and state law.

130. Defendants intentionally misrepresented that Mary and Jeremy had failed to provide medical and mental health care for A.C. and that Mary had declined to provide consents, which was untrue, and such knowingly false statements resulted in A.C. being removed from the Parents' care.

131. Defendants also intentionally misrepresented that the Parents' refused services and resources to address the alleged neglect, which was untrue, and such knowingly false statements resulted in A.C. being removed from the Parents' care.

132. Defendants also intentionally misrepresented that the Parents' use of names and pronouns consistent with A.C.'s biological sex and consistent with their deeply held religious beliefs amounted to derogatory or abusive language requiring removal from the home.

133. Defendants also intentionally misrepresented—despite the fact the Parents were following the recommendations of the primary care physician and there was no diagnosis concerning A.C.'s mental health—that A.C. was suffering from a lack of mental and emotional support in the household and that A.C. was more likely to have thoughts of self-harm if allowed to remain in the home.

134. Defendants also intentionally substantiated allegations of neglect against Mary and Jeremy after receiving written confirmation that Mary and Jeremy were caring for A.C.'s educational, medical, and mental health needs.

135. Defendants' conduct proximately caused Plaintiffs' damages.

136. Defendants' actions occurred during the implementation of a custom, policy and practice of DCS.

**SECOND CAUSE OF ACTION**

**Violation of the Fourteenth Amendment to the U.S. Constitution: Defendants Sexton and Lehman**

*Infringement on the Right to Care, Custody and Control of Children*

137. Plaintiffs incorporate all of the paragraphs above as if fully set forth herein.

138. Defendants unlawfully infringed and intruded upon the rights of Mary and Jeremy Cox when Defendants cited the Parents' refusal to allow DCS to transmit materials contrary to the Parents' beliefs to A.C. as proof of their neglect.

139. Defendants also unlawfully infringed and intruded upon the rights of Mary and Jeremy when they alleged that the Parents' exercise of their deeply held religious beliefs and best judgment concerning the use of cross-gender names and pronouns amounted to neglect sufficient to merit removal of a child from a parent's custody.

140. Defendants also unlawfully infringed and intruded upon the rights of Mary and Jeremy when they recommended that A.C. be placed in a kinship placement that taught principles and behavior directly contrary to the Parents' best judgment and religious beliefs.

141. Defendants' conduct proximately caused Plaintiffs' damages, including but not limited to the loss of the companionship of their child.

142. Defendants' actions occurred during the implementation of a custom, policy and practice of DCS.

**<u>THIRD CAUSE OF ACTION</u>**
**<u>Violation of Substantive and Procedural Due Process Rights:</u>**
**<u>Defendants Sexton and Lehman</u>**

143. Plaintiffs incorporate all of the paragraphs above as if fully set forth herein.

144. Plaintiffs have a fundamental right to privacy which is protected by the Fourteenth Amendment. Included in their Fourteenth Amendment right to privacy is the right to raise their children as they see fit.

145. Defendants' conduct violated the substantive due process rights of the Mary and Jeremy Cox to direct the upbringing of A.C.

146. Defendants acted under the color of state law.

147. Defendants' conduct deprived Mary and Jeremy of rights protected by federal and state law without any finding or legal authority to do so.

148. Defendants either participated directly in the alleged constitutional violation, had actual knowledge thereof and failed to intervene, created a policy or custom under which the unconstitutional practices occurred or allowed them to continue, were grossly negligent in their

actions, or exhibited deliberate indifference to the Parents' rights by failing to act in the face of knowledge that unconstitutional acts were occurring.

149. The Plaintiffs also have a right to the due process of law.

150. Defendants' conduct deprived Mary and Jeremy of rights protected by federal and state law without any finding or legal authority to do so as the trial court determined that A.C. was a child in need of services in reliance on the Defendants' misrepresentations and prior to the Parents being given an opportunity to testify and present evidence.

## <u>FOURTH CAUSE OF ACTION</u>
## <u>Malicious Prosecution:</u>
## <u>Defendants Sexton and Lehman</u>

151. Plaintiffs incorporate all of the paragraphs above as if fully set forth herein.

152. Defendants had no good faith factual or legal basis for the CHINS Action.

153. The CHINS Action was malicious.

154. Defendants had no probable cause to file or prosecute the CHINs Action.

155. Defendants continued to prosecute the CHINS Action even with actual knowledge that there was no evidence to support the CHINS Action.

156. The CHINS Action was voluntarily dismissed in favor of Plaintiffs, without a fact-finding hearing.

157. Plaintiffs sustained damages as a result of the CHINS Action.

## <u>FIFTH CAUSE OF ACTION</u>
## <u>Abuse of Process:</u>
## <u>Defendants Sexton and Lehman</u>

158. Plaintiffs incorporate all of the paragraphs above as if fully set forth herein.

159. Defendants lacked a good faith factual basis to pursue their claims, but nonetheless refused to dismiss the CHINS Action until a few days prior to the fact-finding hearing.

160. Defendants willfully ignored evidence demonstrating that there was no factual basis to pursue the claims against Plaintiffs.

161. The allegations made by DCS against Plaintiffs were ultimately found to be unsubstantiated after more than five months of litigation.

162. Defendants' conduct was abusive, willful, malicious and designed to conceal Defendants' wrongful conduct and avoid public embarrassment.

163. Plaintiffs sustained damages as a result of Defendants' unlawful actions.

**SIXTH CAUSE OF ACTION**
**Violation of the First Amendment of the U.S. Constitution:**
**Defendants Sexton and Lehman**
***Failure to Accommodate Religious Practice***

164. The Plaintiffs incorporate all paragraphs above as if fully set forth herein.

165. Defendants unlawfully infringed and intruded upon the rights of Mary and Jeremy when the Defendants cited the Parents' refusal to allow DCS to transmit materials contrary to the Parents' beliefs to A.C. as proof of their neglect.

166. Defendants also unlawfully infringed and intruded upon the rights of Mary and Jeremy when they alleged that the Parents' exercise of their sincerely held religious beliefs concerning sex and cross-gender pronouns and names amounted to neglect sufficient to merit removal of a child from a parent's custody.

167. Defendants also unlawfully infringed and intruded upon the rights of Mary and Jeremy Cox when they recommended that A.C. be placed in a kinship placement that taught principles and behavior directly contrary to the Parents' best judgment and religious beliefs.

168. Defendants' actions were deliberate and purposeful, with the intent to deprive Mary and Jeremy of their right to freedom of religion.

**<u>SEVENTH CAUSE OF ACTION</u>**
**<u>Violation of the First Amendment of the U.S. Constitution:</u>**
**<u>Defendants Department of Child Services</u>**
**(U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)**
*Compelled Speech*

169. The Plaintiffs incorporate all paragraphs above as if fully set forth herein.

170. By investigating a report that focused on allegations that the Parents were referring to A.C. in a manner consistent with A.C.'s biological sex, the Defendant compelled Mary and Jeremy to express their viewpoint on cross-gender pronouns and names and gender identity.

171. The Defendant then discriminated against Mary and Jeremy for not speaking its message or viewpoint on cross-gender pronouns and names and gender identity.

172. The Constitution protects Mary and Jeremy's right to speak and to refrain from speaking—especially to their children in their own home.

173. Compelled speech imposes additional harm, and so requires an even more urgent justification.

174. The government must withstand "exacting scrutiny" in order to furnish this more urgent justification for compelled speech, which requires showing that compelling Mary and Jeremy to use A.C.'s preferred name and pronouns and affirm A.C.'s transgender ideology furthers a compelling interest that could not be secured by significantly less restrictive means.

175. Mary and Jeremy wished to remain silent—to not speak the Defendant's viewpoint concerning cross-gender pronouns and names and gender identity.

176. The Defendant had no compelling interest in forcing Mary and Jeremy to refer to A.C. according to A.C.'s preferred cross-gender pronouns and name.

177. Additionally, the Defendant's decision to advocate for removal from the Parents' home was not narrowly tailored because the Parents were already following the recommendations of their primary care physician in seeking medical and mental health care.

178. The Defendant could have taken a number of alternate steps to address their concerns, such as requesting medical consents to verify the Parents' statements, placing A.C. with

Jeremy while any concerns about vulgar language were addressed, and instructing A.C. that the Parents' religious beliefs and religious exercise did not amount to neglect and should be respected.

179. Instead, the Defendant left the Parents with a terrible choice—speak a message contrary to their best judgment and deeply held religious beliefs to their own child in their own home or face the removal of A.C. from their home.

180. The Defendant even asked to send the Parents and A.C. resources inconsistent with Parents' beliefs and cited the Parents' caution toward those resources as evidence of neglect.

181. Due to these actions, the Defendant has chilled and continues to chill the Parents' speech to their own children in their own home; and the Defendant's actions would deter a person of ordinary firmness from engaging in protected speech.

182. Therefore, the Defendant's actions compelling speech fail exacting scrutiny or any other potentially applicable First Amendment standard, and DCS has violated the Parents' right to be free from compelled speech. The Parents have every reason to fear that the Defendant will employ the same policy or actions and compel speech contrary to their religious beliefs as a condition of keeping their minor children in their custody.

## EIGHTH CAUSE OF ACTION
## Violation of the First Amendment of the U.S. Constitution: Defendant Department of Child Services

*Viewpoint Discrimination*

183. The Plaintiffs incorporate all paragraphs above as if fully set forth herein.

184. The DCS evidence, taken together, expresses the message that people can have a gender identity inconsistent with their sex and that failure to affirm this message harms children.

185. And the DCS evidence claims that the Parents were, in fact, failing to support A.C. emotionally because they were not promoting this message.

186. The DCS evidence also claims that the Parents refused resources promoting this message as evidence of neglect.

187. And the Defendant advocated for removal or at least continued removal from the Parents' home after receiving written proof that the Parents' were caring for A.C.'s educational, medical, and mental health needs.

188. By investigating Parents who hold a viewpoint other than the Defendant's and by advocating for the removal of A.C., the Defendant singled out the Parents' viewpoints and barred them, on the pain of losing custody of their child, from expressing their viewpoints.

189. What Defendant has done here—discriminating against speech because of its message—is presumptively unconstitutional.

190. Backed by the threat of losing custody of their children, therefore, the policy and practice of DCS has chilled and continues to chill the Parents' speech and would deter a person of ordinary firmness from engaging in protected speech.

191. Therefore, the Defendants have discriminated and continue to discriminate against the Parents' speech based on their viewpoint, contrary to the Constitution.

**NINTH CAUSE OF ACTION**
**Violation of the First Amendment of the U.S. Constitution:**
**Defendant Department of Child Services**
*Free Exercise of Religion*

192. The Plaintiffs incorporate all paragraphs above as if fully set forth herein.

193. The Constitution protects the Parents' right to freely exercise their religion.

194. The Constitution requires DCS to act in a neutral and generally applicable manner toward the Parents and their religious beliefs and bars even subtle departures from neutrality on matters of religion; even a slight suspicion that the actions of DCS stem from animosity towards the Parents' religious belief or practice violates the Constitution.

195. DCS specifically investigated the Parents because they were not referring to A.C. using cross-gender names and pronouns, and the Parents clearly and repeatedly informed DCS that using such names and pronouns would violate the Parents sincerely held religious beliefs.

196. Instead of respecting those beliefs, DCS attempted to change those beliefs; compared them to neglect; filed a CHINs action; substantiated allegations of neglect against the Parents after receiving proof that the Parents were providing for the medical, educational, and mental health needs of A.C.; and recommended a placement specifically chosen because the placement verbally affirmed beliefs contrary to those of the Parents.

197. This was a constitutional violation of the highest order as it cost the Parents not just a job or even property—but the very custody of their own child.

198. DCS has failed to act in a neutral manner toward the Parents' beliefs and has instead acted with hostility toward the Parents' beliefs.

199. DCS has failed to act in a neutral manner because its policies and practices require individualized assessment of allegations of neglect and abuse.

200. The policy or practice of DCS substantially burdened and burdens the Parents' religious exercise because it forces them to choose between violating their beliefs and losing custody of their child or children.

201. The policy or custom of DCS also substantially burdened and burdens the Parents' right to religious speech, which heightens the constitutional protection.

202. DCS had no compelling interest in advocating for the removal of A.C. from Mary and Jeremy's custody because their religious beliefs compelled them to refer to A.C. in a manner consistent with A.C.'s biological sex and because the Parents were already meeting A.C.'s medical, educational, and mental health needs.

203. Additionally, DCS' advocacy for removal from the Parents' home was not narrowly tailored because the Parents were already following the recommendations of their primary care physician in seeking medical and mental health care.

204. Furter, DCS could have taken a number of alternate steps to address its concerns, such as requesting medical consents to verify the Parents' statements concerning medical and mental health care, placing A.C. with Jeremy while any concerns about vulgar language were addressed, and

instructing A.C. that the Parents' religious belief and exercise did not amount to neglect and should be respected.

205. Because DCS enforced this policy or practice against the Parents in a way that was not narrowly tailored to further any compelling interest, DCS' actions, policy, and practice fail strict scrutiny and violate the Parents' right to be free from substantial burdens on their religious exercise.

## TENTH CAUSE OF ACTION
## Indiana Religious Freedom Restoration Act
## (Ind. Code §§ 34-13-9-0.7 through -11)

206. The Plaintiffs incorporate the preceding rhetorical paragraphs as if fully set forth herein.

207. Under the Indiana Religious Freedom Restoration Act, DCS "may not substantially burden" the Parents' "exercise of religion, even if the burden results from a rule of general applicability." Ind. Code § 34-13-9-8(a).

208. DCS specifically investigated the Parents because they were not referring to A.C. using cross-gender pronouns and names, and the Parents clearly and repeatedly informed DCS that using such names and pronouns would violate the Parents sincerely held religious beliefs.

209. Instead of respecting those beliefs, DCS attempted to change those beliefs; compared them to neglect; filed a CHINs action; substantiated allegations of neglect after receiving proof that the Parents were providing for the medical, educational, and mental health needs of A.C.; and recommended a placement specifically chosen because the placement verbally affirmed beliefs contrary to those of the Parents.

210. DCS has failed to act in a neutral manner toward the Parents' beliefs and has instead acted with hostility toward the Parents' beliefs.

211. DCS had no compelling interest in advocating for the removal of A.C. from Mary and Jeremy's custody because their religious beliefs compelled them to refer to A.C. in a manner

consistent with A.C.'s biological sex and because the Parents were already adequately caring for A.C. medical, mental health, and educational needs.

212. Additionally, DCS' advocacy for removal from the Parents' home was not narrowly tailored because the Parents were already following the recommendations of their primary care physician in seeking medical and mental health care.

213. DCS could have taken a number of alternate steps to address its concerns, such as requesting medical consents to verify the Parents' statements concerning medical and mental health care, placing A.C. with Jeremy while any concerns about vulgar language were addressed, and instructing A.C. that the Parents' religious belief and exercise did not amount to neglect and should be respected.

214. Because DCS enforced this policy or practice against the Parents in a way that was not narrowly tailored to further any compelling interest, DCS' actions, policy, and practice fails strict scrutiny and violates the Parents' right to be free from substantial burdens on their religious exercise.

215. As a result, DCS cannot demonstrate that its actions are "the least restrictive means of furthering [a] compelling governmental interest." Ind. Code § 34-13-9-8(b).

216. Therefore, DCS violated and is violating Indiana's Religious Freedom Restoration Act.

## JURY DEMAND

217. A jury trial is demanded on all the issues so triable. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

The Parents respectfully requests that this Court enter judgment against the Defendants, jointly and severally, and provide them the following relief:

A. A declaratory judgment that the DCS policy and practice, as described above, is unconstitutional as applied to the Parents under the First and Fourteenth Amendments to the U.S. Constitution and violates the Indiana Religious Freedom Restoration Act;

B. A permanent injunction prohibiting the Defendants from investigating or filing a CHINs action against the Parents because they will not use cross-gender pronouns or names or otherwise affirm a viewpoint concerning gender identity that is contrary to their sincerely held religious beliefs and best judgment;

C. Compensatory damages (including but not limited to damages for pain, suffering, emotional distress, humiliation, inconvenience, and reputational harm), nominal damages, and such other damages to which the Parents may be entitled;

D. The Parents' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988, I.C. § 34-13-9-10 or other relevant statute; and,

E. All other relief to which the Mary and Jeremy Cox may be entitled.

Dated: March 19, 2024

Respectfully submitted,

/s/ Joshua D. Hershberger

JOSHUA D. HERSHBERGER
Indiana Bar No. 29679-39
HERSHBERGER LAW OFFICE
P.O. Box 233
Hanover, Indiana 47243
(812) 228-8783
josh@hlo.legal
*Attorney for Plaintiffs*

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed on March 19, 2024.

Mary L Cox

Mary Cox

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed on March 19, 2024.

Jeremy Cox

Jeremy Cox